The opinion of the Court was delivered by
Dunkin, Ch.
It is proposed first to consider the imputed error of the decree in rendering the appellant accountable for the value of the slave, George. It appears that, on 24th April, 1854, the intestate executed a bill of sale of George to the defendant for the consideration of $1,000. The bill of sale was in the handwriting of the defendant, who resided in Abbeville district, — contained a warranty of title and soundness, and was executed by the intestate under his hand and seal, in presence of attesting witnesses. George passed immediately into the possession of the defendant, with whom he remained for about two years thereafter; and dis-' appeared, to wit: about April, 1856, in the manner stated in the evidence. These proceedings'on the part of the next of kin of the intestate were instituted-1858, and it is, among other things, substantially and directly charged, that, although the bill of sale of April, 1854, was for an apparent valuable consideration, yet the money on that occasion paid to the intestate, was, in fact, his own money, being the earnings of his slave George placed in the hands of the defendant for that purposp; and that a secret trust existed, that George *18 was to be emancipated by the defendant, or held by him in nominal servitude. The bill calls upon the defendant to answer upon oath, all and singular the matters charged. Thus interrogated, the defendant answered that he did purchase George at the time mentioned — that he made the purchase at the request of George, who desired that the defendant might be his master, because he, George, would be near/his wife who lived in that neighborhood — that he, the defendant, sent the bill of sale, drawn by himself, with the sum of one thousand dollars, to be paid to the intestate by whom the bill of sale was to be executed — the defendant avers that all the money paid for George was his own money, and that no part was the earnings of George — that, from the time of the execution of the bill of sale, George remained with the defendant as his master, and that there was no trust, or confidence, when the defendant became the owner of George, that he should be held in nominal servitude, or should be emancipated. By the decree of the Circuit Court, it is held that this answer of the defendant in relation to the payment of the consideration, is “somewhat equivocal.” “But that, at all'events, the defendant was bound to prove his averment of payment.” And again, it is held that, “although the answer alleges the payment of money for George, no evidence of the payment is made. The answer on this point is not responsive, so as to be self-proving; and the bill of sale of April must be treated as a mere voluntary conveyance.”
The existence and the exigency of the general rule of this Court is not called in question, to wit: that the answer of a defendant responsive to the charges of the bill, should, in general, be taken as true unless contradicted by two witnesses, or one witness, and strong corroborating circumstances. But the Chancellor rests his decision on the distinction, recognized by the Court in Cloud vs. Calhoun, 10 Rich. Eq., 358, that the answer has not this effect when “ suggesting matters of independent defence or avoidance.” The distinction, though not so familiar as the rule, is certain *19 ly well established as well in reason as by authority. A defendant, charged with the receipt of a sum of money, and by his answer admitting the receipt, cannot exonerate himself by an averment that he had paid it to the plaintiff’s use. But to a majority of this Court, it seems a misapprehension to hold, in this case, that “the defendant was bound to prove the payment of the consideration money.” As against the intestate and all claiming as volunteers under him, the bill of sale of 24th April, 1854, under the hand and seal of the intestate, stands for proof, until successfully assailed. The onus of proof is on those who maintain that the deed speaks other than the truth. To establish this, the plaintiffs, by their bill, undertake to purge the conscience of the defendant, and require him to answer the charge that the money paid was not, as the bill of sale purports, his (defendant’s) money, but was the earnings of the slave of the intestate, and consequently, in law, the intestate’s own money. When the defendant replies to this, that “all the money paid for George was his own money,” and, not content with this, adds, “ and that no part was the earnings of George,” it appears to the Court a direct and categorical response to the charge of the bill in that behalf, and entitles the defendant to the full benefit of the effect of an answer in such cases. Giving to the defendant the advantage of this rule, he stands as a purchaser for valuable consideration under the bill of sale, 24th April, 1854. The intestate received, in his lifetime, the value of his property. The defendant explicitly denies any fiduciary relation, express or secret — and the Court is not aware of any principle by which the defendant, under these circumstances, can be held responsible for the value of George to the next of kin of the intestate.
The deed, 13th June, 1854, by which the intestate transferred seven slaves (by name) to the defendant, stands on a different footing. It was manifestly voluntary — made to a perfect stranger — and a life estate was reserved to the donor. It was executed on the same day that he attempted to make *20 a testamentary disposition of his whole estate, real and personal, in favor of the same donee. The testimony abundantly establishes that the object of the donor was to contravene the provisions and defeat the policy of the Act of 1841. By the terms of that Act all such efforts are made to enure to the benefit of the next of kin of the donor, but the object of the Act is the protection of the public. And I share in the apprehension of the circuit Chancellor, that the purposes of the Act might easily be frustrated if it were necessary to bring home to the knowledge of the voluntary donee the unlawful designs of the donor. In the analogous case of a voluntary deed in fraud of creditors, it is not necessary to establish the scienter on the part of the donee. In Story’s Eq., § 351, the authority of Pothier and other civil law writers is cited for the doctrine applicable to this class of cases. It was the rule of the civil law to avoid all alien-ations or other dispositions of their property made by debtors to defraud their creditors. Hence all such dispositions were annulled, whether the donee knew of the prejudice intended to the creditors or not. In the language of Pothier, the inquiry is not whether he, to whom the gift was made, knew of the intention of the donor, but only whether the creditor was defrauded. The voluntary donee has no cause of complaint except that he is not permitted to enjoy that which the donor had no right to give away. But it is difficult to infer a want of knowledge on the part of the defendant. The design of the intestate is clearly established. Shortly prior to June, 1854, he had executed a deed of the same character to another person (Johnson), which was after-wards returned to him, declaring, at the time, that his wish was “ to have his negroes free and not serve after his death.” And, again, the witness, Crews, says that, some time before the deed, George, in presence of intestate, said “ the old man wished the negroes free, and carried to a free State after his death, and land to pay expensesand George offered to have a will made in his (witness’) name. That he (the wit *21 ness) had some idea of accepting the offer at first, but, on reflection, declined. Then, on the same day, the intestate executed a will, by which he devised and bequeathed his land and slaves to the defendant, and executed this deed by Avhich he transferred to him the slaves only. The defendant was an entire stranger to him. He had heard that “ he was a bachelor and a clever man.” All this proves the purpose, as well as the expectation, of the intestate in executing the papers. Can it be doubted that the defendant, hearing of this unexpected bounty on the part of a perfect stranger, was put on the inquiry, and that his inquiries were satisfied? It does not clearly appear, from the evidence, to whom the deed Avas delivered for the defendant, nor from whom he received it. It probably came to him through the hands of George. But the answer of the defendant in relation to the will, which was a part of the same transaction, is a clear admission of the defendant’s fiduciary relation in some way. “ This defendant was impressed with the idea that a confidence was reposed in him by the said Robert Tucker, deceased — that there was a duty incumbent upon him which it would be sheer weakness to decline — that it Avould be equivalent to a betrayal of a trust.” And that, under this impression, he had taken the necessary steps to test the validity of the will, which had, as to the personalty, terminated unsuccessfully. On the face of the Avill, as well as of the deed, the gift of the property to the defendant Avas equally absolute and unconditional. It was the secret “ confidence” which the defendant “ had an idea was reposed in him” by the donor, and “ which it would be equivalent to a betrayal of trust to decline,” against which the various provisions of the Act of 1841 Avere directed, and Avhich rendered the deed void.
If the conduct of the intestate had been entirely spontaneous, such would be the conclusion in relation to the validity of this instrument. But he was about eighty years of age— exceedingly feeble in mind and body — very much under the influence of his slaves, especially of George, who was shrewd *22 and intelligent. Without recapitulating the evidence detailed in the decree of the Chancellor, his conclusion is well sustained, that “ it clearly established such imbecility on his part as to render him an easy subject of imposition and undue influence,” and the inference is strong, from many parts of the testimony, that the influence of his slaves was manifested in the concoction of the instrument providing for their benefit.
For the reasons hereinbefore stated, we are of opinion that the defendant was not accountable to the distributees of Robert Tucker, deceased, for the value of the slave, George; and that, in this respect, the decretal order of the Circuit Court should be reformed, and it is so ordered accordingly. In all other respects the decree of the Circuit Court is affirmed and the appeal dismissed.
Johnston, Ch., concurred.
Wardlaw, Ch.,
said: I doubt as to the effect given to the answer, and as to the bill of sale for George; I concur in other respects.

Decree modified.